UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Tankship International, LLC,          :
    Plaintiff,                       :
                                     :
v.                                    : Civil No. 3:04cv753 (JBA)
                                     :
El Paso Merchant Energy-Petroleum Co. :
and El Paso Corp.,                    :
    Defendants                       :

RULING ON MOTION TO DISMISS FOR LACK
OF SUBJECT MATTER JURISDICTION [DOC. # 47]

    In this case arising from an alleged maritime brokerage
contract, defendants El Paso Merchant Energy-Petroleum Company
and El Paso Corporation (collectively "El Paso") move to dismiss
the complaint of plaintiff Tankship International, LLC
("Tankship") for lack of federal admiralty jurisdiction.  See
[Doc. # 47].  For the reasons that follow, defendants' motion is
granted.

I.    **Factual and Procedural Background**

    Plaintiff filed the original complaint in this case on May
5, 2004, invoking this Court's diversity jurisdiction.  See
Complaint [Doc. # 1] at 1.  Discovery was taken, concluding in
July 2005, and a bench trial was initially scheduled for October
2005.  See Scheduling Order [Doc. # 22].  However, it came to the
parties' attention through discovery that complete diversity of
citizenship was lacking, and in September defendants were granted
permission to file a motion to dismiss for lack of subject matter

1

jurisdiction.  Plaintiff filed an Amended Complaint on October 3, 2005, asserting the existence of federal admiralty and maritime jurisdiction under 28 U.S.C. § 1333, see Am. Compl. [Doc. # 45] at ¶ 1, which defendants now challenge.  Oral argument was held on December 22, 2005, following which the parties were given an opportunity to file supplemental briefing with an evidentiary record.

The dispositive issue on the jurisdictional dispute here is whether the oral agreement between defendant El Paso and third-party Heidmar was a simple brokerage arrangement in which plaintiff Tankship was to serve as the broker, or whether there was an agreement for Tankship to provide "operational liaison services" to Dorado Pool operator Heidmar and vessel owner OMI Corporation of Stamford ("OMI") as well, with the jurisdiction-conferring objective of furthering maritime commerce.  Beyond the evidence submitted on this issue, both parties accept the allegations of the complaint as true for purposes of the motion to dismiss.

The Amended Complaint and supplemental submissions reveal the following facts.  Tankship, a Connecticut-based company, is "engaged in the business of maritime charter brokering of ocean going vessels and the provision of services to ship owners, operators, managers, charterers, and vessel pool operators."  Am. Compl. at ¶¶ 2, 5.  El Paso, a Texas-based company, is "engaged

in the petroleum products business, including chartering ocean going petroleum tank vessels." Id. at ¶¶ 3, 6.  The two companies have a prior relationship, as Tankship has brokered "numerous contracts" involving El Paso in the past.  Id. at ¶ 10. In September 2000 and May 2001, Tankship brokered long-term deals for El Paso to charter (lease) certain vessels from OMI, and received a brokerage fee "at the customary rate of 1.25% [of the daily fee] per vessel, per day."  Id. at ¶ ¶ 11-13.  By early 2002, however, El Paso was losing a significant amount of money on these arrangements "due to the slack tanker market."  Id. at 20.  Thus, plaintiff "approached El Paso ... with a proposal for placing the seven OMI vessels into a vessel pool."  Id.

As explained in the complaint, "A vessel 'pool' consists of a collection of similar vessel types under various ownerships, placed under the care of a pool administrator.  The administrator markets the vessels as a single, cohesive fleet unit and 'pools' their earnings which, in due course, are distributed to individual owners on the basis of a formula, which reflects the different characteristics of the pool vessels."  Id. at ¶ 21.

The complaint alleges that "[d]espite its mounting losses, at that time El Paso ... was against the idea of placing the OMI vessels in a pool ... and advised Tankship that it had severed all of its relationships with the Dorado Pool operator, Heidmar, earlier in the year."  Id. at 23.  El Paso then decided to begin

3

closing down its marine department altogether, id. at ¶ 26, even
though it still was obligated under the lease for the seven OMI
vessels.

In fall of 2002, Tankship approached the Dorado Pool,[1] which
was "receptive" to the suggestion of El Paso's participation by
placing the OMI vessels in the pool, and when Tankship returned
to El Paso with this information, El Paso "was receptive to the
pool concept with Dorado." Id. at ¶ 25. However, Heidmar, the
pool operator, is a competitor of OMI, the vessel owner, and thus
those parties anticipated difficulty in working together
directly. Plaintiff alleges that, to solve this problem,
"Tankship proposed... that in addition to brokering the placement
of the seven OMI vessels into the Dorado Pool, it would also be
willing to offer its services as an operational liaison" between
all the parties "to facilitate communication and distribution of
information relating to the operation of the vessels during the
period the vessels operated in the pool." Id. at ¶ 27.
Tankship's written proposal to El Paso and Heidmar, however, did
not address the issue of "operational liaison services," but
merely suggested a "1.25 pct brokerage commission to Tankship."
El Paso Marine and Heidmar Proposal, 11/22/02, Silvestri Decl.
Ex. C at 2.

---

[1]Plaintiff's supplemental submission [Doc. # 61] states that
Heidmar approached Tankship, but this factual variance is
immaterial to the issue of subject matter jurisdiction.

At Tankship's urging, a meeting between El Paso and Heidmar took place in December 2002.  Plaintiff alleges that the El Paso and Dorado representatives agreed that because El Paso was in the process of closing its marine department, "it would be necessary and desirable to have Tankship provide the operational liaison services" between them.  Id. at ¶ 29.  One of El Paso's representatives at the December 2002 meeting, Matthew Warren, testified that the only discussion at that time concerning Tankship was that Tankship was "the broker involved in the negotiation of this pool."  Warren Depo. at 97, Silvestri Decl. Ex. B.

El Paso's written proposal presented at that meeting stated that OMI's vessels were to be placed in the Dorado pool "via Tankship.  All operational correspondence with head owner [OMI] to take place via Tankship."  Id. Ex. D.  Timothy Brennan, who attended the meeting on Heidmar's behalf, explained:

> Q.   What did you mean by writing that?
>
> A.   That ... we would just deal with Tankship instead of having to go from ourselves to El Paso to Tankship to OMI.  So we would just deal with ourselves and Tankship and OMI and then copy El Paso.
>
> Q.   Tankship in that would be the broker?
>
> A.   Yes.
>
> Q.   The broker between El Paso and the [Dorado] pool, correct?
>
> A.   Yes.

5

Brennan Depo. at 54, Silvestri Decl. Ex. E.

John Douglas Roberts, principal and owner of Tankship,
stated in a January 16, 2006 affidavit that by agreeing to
participate in this arrangement, Tankship bound itself to offer
the following services to El Paso and Heidmar:

  a.  monitoring the operations and movements of all
      seven OMI ships on a daily basis;

  b.  monitoring the particular cargoes being carried by
      each ship;

  c.  facilitating the completion of "Q88" vessel
      questionnaires[2] by the vessel Owner, OMI, and
      providing such questionnaires to Dorado/Heidmar;

  d.  negotiation of "letters of indemnity["] ("LOI's")
      between OMI, Dorado/Heidmar and cargo interests
      for delivery of cargoes without presentation of
      bills of lading;

  e.  negotiation of "letters of indemnity["] ("LOI's")
      between OMI, Dorado/Heidmar and cargo interests
      for change of vessel destination;

  f.  transmission of voyage instructions from
      Dorado/Heidmar to OMI and/or the captains of the
      seven OMI vessels (OMI had made it known that it
      did [sic] would not permit Dorado/Heidmar to
      communicate with the vessel crew which is
      essential to daily ship operations);

  g.  transmission of information between OMI and
      Dorado/Heidmar relating to the vessels'
      particulars/characteristics/specifications, e.g.
      vessel drafts on certain conditions, in relation
      to particular port calls;

  h.  coordinating with major oil companies that would

_____

[2]The substance or purpose of a "Q88" questionnaire is
unexplained, but it appears to be a standard form listing the
specifications and availability of commercial ships.

6

use the ships while in the pool to ensure their "approval" of the ships;

i.   coordination of claims between Dorado/Heidmar and El Paso and between El Paso and OMI regarding demurrage, dockage fees, wharfage fees, vessel detention, etc.

j.   coordination of services provided by "lightering" companies for the discharge of cargoes from the seven OMI vessels at various port calls;

k.   communications with third party cargo interests with regard to vessel's [sic] "estimated times of arrival" at loading and discharging ports, cargo stowage plans, rate of loading/discharging affecting the bill of lading date, port changes, bunker/fuel requirements, cargo intake specifications/requirements, vessel/port draft restrictions and vessel characteristics/ specifications *not* included in the "Q88" questionnaires; and

l.   facilitating agreements between cargo interests, Dorado/Heidmar and OMI regarding commingling of various cargo parcels on board the vessels.

Roberts. Aff. [Doc. # 63] at ¶ 13.  There is no evidence that Roberts or any Tankship representative attended the December 16, 2002 meeting between El Paso and Heidmar, and, in fact, the participants explained that the Tankship was specifically excluded because the meeting's purpose was only to present an initial proposal, not to negotiate terms of the transaction.  The record also lacks any evidence that the broad range of "services" described by Roberts was contemplated by El Paso and Heidmar, beyond "operational correspondence."

El Paso placed its vessels in Heidmar's Dorado pool as of April 2003.  Id. at ¶ 32.  El Paso, however, refused to pay any

commission to Tankship, asserting that defendant "had no
intention of contracting with you or your firm with respect to
the entry of the [OMI time-chartered ships] into the Dorado pool
... [and] does not consider itself as being contractually bound
to you or your firm in any way with respect to this subject."
Roberts Aff. Ex. 4.  Tankship has alleged breach of contract for
failure to pay the customary commission of 1.25% per day, per
ship (Count One), and, alternatively, claims for quantum meruit
(Count Two) and unjust enrichment (Count Three).  There is no
claim that a written brokerage contract existed between El Paso
and Tankship.[3]

## II.  Standard

"A case is properly dismissed for lack of subject matter
jurisdiction ... when the district court lacks the statutory or
constitutional power to adjudicate it."  Makarova v. United
States, 201 F.3d 110, 113 (2d Cir. 2000).  Under Rule 12(h)(3),
the issue of the Court's subject matter jurisdiction may be
raised at any time: "Whenever it appears by suggestion of the
parties or otherwise that the court lacks jurisdiction of the
subject matter, the court shall dismiss the action."  Fed. R.
Civ. P. 12(h)(3).  Thus the Court will consider defendants'
motion "because the issue of jurisdiction can be raised any time

---

[3]The Statute of Frauds does not apply to maritime contracts
because oral contracts are valid under maritime law.  Kossick v.
United Fruit Co., 365 U.S. 731, 734, 742 (1961).

during the proceedings." Gonzalez v. Rubin, 225 F.3d 662 (9th Cir. 2000).

"When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint.  But, when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Fin. Servs. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (citations omitted).  A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.  Makarova, 201 F.3d at 113; see also Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996) ("The burden of proving jurisdiction is on the party asserting it.").

## III. Discussion

The federal courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction...." 28 U.S.C. § 1333(1).  "The boundaries of admiralty jurisdiction over contracts--as opposed to torts or crimes--being conceptual rather than spatial, have always been difficult to draw." Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961).

As the Supreme Court recently held, the modern rule is that courts should look to "the nature and character of the contract,

9

and the true criterion is whether it has reference to maritime service or maritime transactions," because "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce." Norfolk Southern Ry. Co. v. Kirby, 543 U.S. 14, 24-25 (2004) (internal citations, quotation marks and alteration omitted, emphasis in original).  Thus, the focus usually is "on whether the principal objective of a contract is maritime commerce." Id. at 25.

While historically, certain types of contracts have been per se excluded from federal admiralty jurisdiction, the per se exclusion of agency contracts (i.e., contracts for the procurement of goods) was overruled in Exxon Corp. v. Central Gulf Lines, 500 U.S. 603, 607 (1991), in favor of the more conceptual "protection of maritime commerce" approach.  As noted by the Second Circuit, however, the Supreme Court has not overruled the blanket exclusion of "preliminary services contracts," which "has been applied somewhat mechanically to brokerage agreements involving ship charters." Shipping Fin., 140 F.3d at 132-33.

In Shipping Financial, the Second Circuit declined to decide whether Exxon should be read to overrule the "preliminary contracts" doctrine as well.  140 F.3d at 133 ("[A]lthough Exxon plainly discourages per se exclusions to maritime claims, it stops short of entirely eliminating the preliminary contract

10

doctrine.  We pass on this opportunity...").  Shipping Financial
had alleged that the defendants, Duke Petroleum and an individual
owner named Drakos, who were the long-term charterers of a
vessel, had requested that plaintiff find a subcharterer.
Plaintiff contacted OMI Petrolink Corporation, which operates
vessels in the Gulf of Mexico.  Id. at 131.  Plaintiff
specifically suggested to defendants that the "Gulf of Mexico
lighterage trade offered the best prospects" for finding a
subcharter.  Id.  OMI refused the subcharter, and while the
plaintiff looked for other options, "OMI entered into a
subcharter with defendants ... through OMI's broker, causing
[plaintiff] to lose an anticipated commission."  Id.  Plaintiff
sued Duke and Drakos for breach of contract and unjust
enrichment, and OMI for interference with a business
relationship.  Id.  The Second Circuit held that even if the
modern "nature and subject matter analysis" governed the case,
the complaint did not allege facts sufficiently tied to maritime
commerce to justify the exercise of federal maritime
jurisdiction:

> Essentially..., the contract between plaintiff and
> defendants involves plaintiff acting as a broker for Duke
> Petroleum and Drakos.  Shipping Services undertook no
> other responsibilities.  Nor does plaintiff's purported
> role in giving advice about seeking a subcharter in the
> Gulf lighterage trade elevate its status to anything
> other than a broker.  Plaintiff makes no other
> affirmative showing that its contract is "maritime in
> nature."

Id. at 134.  Thus, although the Court of Appeals emphasized "the fact specific nature of [its] decision," id., it is apparent that a contract for brokerage services would not be viewed by the Second Circuit,[4] as affecting maritime commerce.

Plaintiff Tankship argues that its role was more than that of a broker because it agreed to provide "operational liaison services" that were "inexorably intertwined with the ongoing operation of the OMI vessels in the pool, which engaged exclusively in maritime commerce."  Pl. Mem. of Law in Opp. [Doc. # 49] at 13.  Plaintiff further argues that "it was Defendants' own actions in breach of the contract that precluded Tankship from providing the operational liaison services," and therefore defendants should not now be heard to deny the existence of such an ongoing agreement.  Id. at 14.

Contrary to Tankship's assertions, its complaint and supplementary evidence cannot be fairly read to assert or support the existence of any agreement between Tankship and El Paso for ongoing provision of operational liaison services beyond facilitating communication and distribution of information relating to the operation of the vessels while they operated in

---

[4]Cf. Kan Int'l., Inc. v. Coastal Tankships U.S.A., Inc., 108 F.3d 1385 (9th Cir. 1997) (unpublished table opinion) (holding that "because charterparty brokerage has a significant impact on 'maritime commerce,'" case was governed by federal admiralty law and plaintiff therefore was required to submit its claim for prejudgment interest to the jury).

the pool.  Plaintiff alleges that it "proposed to both El Paso" and the Dorado Pool that "it would also be willing to offer its services as an operational liaison between" the parties.  Am. Compl. ¶ 27 (emphasis supplied).  The complaint further alleges that the "Dorado Pool representatives (Heidmar) and El Paso[]'s chartering manager, Matthew Warren, discussed during their negotiations that it would be necessary and desirable to have Tankship provide the operational liaison services...."  Id. at ¶ 30 (emphasis supplied).  However, not only does the complaint not allege any contractual agreement between Tankship and El Paso for Tankship to provide ongoing liaison services related to maritime commerce while El Paso's vessels operated within the Dorado Pool, plaintiff does not seek any damages for breach of any such agreement -- the measure of damages sought in this case is the 1.25% brokerage commission.  Am. Compl. ¶¶ 35, 41, 47.

The affidavit of John Douglas Roberts, setting forth numerous services Tankship allegedly agreed to provide to Dorado and OMI, contains no basis for his assertions that plaintiff would have been bound to provide the expansive services he describes as encompassed in the role of "operational liaison." Roberts did not attend the December 16, 2002 meeting, which was limited to representatives of El Paso and Heidmar.  He does not explain the basis for his belief that an agreement between Tankship and El Paso that plaintiff was the broker contemplated,

13

much less obligated, plaintiff to provide these services.

Further, he does not explain how Tankship could become obligated

to provide these services during a meeting between Heidmar and El

Paso that did not include any representative from Tankship.

Roberts states that he believed Tankship became entitled to its

commission, which was to be its sole compensation for both its

brokerage services and any future "operational liaison services,"

when El Paso and Heidmar reached a "handshake" deal.  Roberts

Aff. at ¶ 11.  Warren, who actually was present for the

"handshake," testified that the only agreement reached by El Paso

and Dorado at that time was that Tankship would be considered the

broker for the deal.  Warren Depo. at 102.[5]  There is no evidence

that the individuals present in the room had Roberts' detailed

list of services in mind when reaching their tentative agreement.

While El Paso's written proposal to Heidmar/Dorado for the

December 16, 2005 meeting  suggested that Tankship would be the

conduit for "operational correspondence," the uncontradicted

testimony from the individuals present at the meeting shows that

the details of Tankship's role never actually came up in the

discussion.  Warren Depo. at 101-02; Brennan Depo. at 54.

Moreover, even if Tankship's proposal to serve as a go-

---

[5]Defendants argue that Warren had no authority to bind El
Paso to any deal at all, Def. Supp. Mem. at 2, but the Court does
not reach the question of whether the "handshake" in fact bound
El Paso and Heidmar to a deal, and thus whether Tankship was
entitled to a brokerage commission.

between, so OMI and Heidmar did not have to deal directly with each other, could be inferred to have been "accepted" by El Paso, the evidence shows that the proposal actually suggested by El Paso to Heidmar was limited to "operational correspondence." Brennan testified that "operational correspondence" meant only that Tankship would pass along directions to and from OMI and Heidmar/Dorado, skipping over El Paso, and that by doing so Tankship was fulfilling the role of broker. Thus the role of intermediary for "operational correspondence" has not been shown to "reference... maritime service or maritime transactions." <u>See Norfolk Southern</u>, 543 U.S. at 24. It is a middleman role that a broker in any field might play, regardless of the subject of the contract, to bring together two competing parties who did not wish to communicate directly, even if in this case the subject matter of those transmitted communications would have included voyage instructions and details.

Plaintiff asserts that it would have been to the benefit of OMI, the vessel owner, and Heidmar, the operator of the Dorado pool, for Tankship to provide liaison services, due to the competition between OMI and Heidmar, and due to the imminent closing of El Paso's marine department, but the existence of these incentives does not support the conclusion that El Paso and Heidmar actually agreed that Tankship should play an ongoing operational role in marine commerce while OMI's vessels were

placed with Heidmar.

On this record, the present case is distinguishable from
Compania Tauben S.A. v. Stolt Tankers, Inc., 686 N.Y.S.2d 916
(N.Y. Sup. Ct. 1998), upon which plaintiff heavily relies.  In
that case, the plaintiff alleged the existence of a five year
contract for the provision of "numerous maritime services,"
including negotiation of the duration, volume, prices, and
selection of ports for all of the defendant's shipping contracts.
Id. at 919.  Discovery in this case has been concluded and the
evidence proffered in support of subject matter jurisdiction does
not support the conclusion that any ongoing maritime services
agreement was consummated between Tankship and El Paso that
contemplated Tankship playing a role beyond liaison for
facilitating communication and distribution of information
relating to the operation of the vessels among participants, as
plaintiff's complaint alleges.  This is substantially identical
to the agreement in Shipping Financial.[6]

The Court concludes that plaintiff's counsel was correct
when he initially stated to the Court at the June 10, 2005 status
conference that "[t]his is not a maritime case."  See Tr. at 3,

---

[6]The Court disagrees with plaintiff that Norfolk Southern overruled
Shipping Financial.  Norfolk Southern reaffirmed the modern "maritime service
or transaction" test, but did not address brokerage contracts; the
jurisdictional question in that case was whether a shipping contract that
included an international sea voyage from Australia to Virginia, as well as a
short overland train trip within Virginia, could be characterized as a
maritime contract, which the Supreme Court answered in the affirmative.  543
U.S. at 27.

16

Silvestri Decl. Ex. A.  In substance this is a breach of contract case in which Tankship claims a brokerage fee for bringing El Paso and Heidmar together for placement of OMI's vessels in the Dorado pool.  Based on the pleadings and evidence presented, plaintiff's claim is not one relating to maritime commerce as required for federal admiralty and maritime jurisdiction, and plaintiff will have to call in another port to seek redress.

## IV.  Conclusion

Because this Court lacks subject matter jurisdiction over plaintiff's complaint, defendants' motion to dismiss [Doc. # 47] must be GRANTED and this case will be closed.

IT IS SO ORDERED.

/s/
_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 28th day of April, 2006.**